**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS** JUDGE JOAN H. LEFKOW

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, and ACTION ALLIANCE OF SENIOR CITIZENS OF GREATER PHILADELPHIA, a non-profit Pennsylvania corporation, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) |

MAGISTRATE JUDGE ASHMAN

01C 8828

Plaintiffs,

Case No._____

v.

JURY TRIAL DEMANDED

BAXTER INTERNATIONAL INC.,

Defendant.

DOCKETED
NOV 1 6 2001

## CLASS ACTION COMPLAINT

Plaintiffs, by their undersigned attorneys, for their class action complaint, allege the claims set forth herein. Plaintiffs' claims as to themselves and their own actions, are based upon their personal knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel.

## NATURE OF THE ACTION

1.      This is a class action brought under the Sherman Antitrust Act, 15 U.S.C. § 2, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and certain state consumer fraud and antitrust acts by Plaintiffs United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW"), for injunctive relief and damages, and Action Alliance of Senior Citizens of Greater Philadelphia (the "Alliance"), for injunctive relief only, on behalf of themselves, the Alliance's members, and as representatives of the class which is defined herein (hereinafter, where injunctive relief is requested, "Plaintiffs" will refer to both UFCW

and the Alliance; where damages are requested, "Plaintiffs" will refer to UFCW only).

2.      Defendant Baxter International Inc. ("Baxter") created and implemented a fraudulent scheme to artificially elevate the prices charged for certain drugs manufactured by it, which drugs are covered under Medicare Part B ("Covered Drugs") and to substantially increase the sales volume and market share of the Covered Drugs at the elevated prices. This scheme has reaped huge profits at the expense of consumers and third party payors.

3.      The fraudulent scheme devised and initiated by the defendant and implemented by its co-conspirators was effectuated by: (i) overstating the average wholesale price ("AWP") for Covered Drugs, which, in accordance with Health Care Financing Administration Program Memorandum AB-99-63, is the figure upon which the Medicare reimbursement rate and co-payment is based; (ii) marketing and promoting the sale of Covered Drugs to doctors based on the doctors' ability to collect inflated payments made by the government and Medicare beneficiaries that exceeded payments possible for competing drugs; (iii) providing doctors and medical care providers with free samples and financial incentives to over-prescribe Covered Drugs or prescribe Covered Drugs in place of competing drugs; and (iv) inducing doctors to overcharge the Medicare program for illegally inflated Covered Drugs reimbursements.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action alleges violations of the Federal Sherman Antitrust Act and the Racketeer Influenced and Corrupt Organizations Act. This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

5.      Plaintiff UFCW is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29

-2-

U.S.C. 186(c)(5), and as defined by section 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, et seq. As such, UFCW is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. 1132(d). UFCW's office from which it pays medical benefits is located in Cook County, Illinois.

6.    Pursuant to the Trust Agreement under which it was created, UFCW provides comprehensive health care benefits to approximately 30,000 participants who are employed under various collective bargaining agreements, and their dependants, as well as retirees. UFCW's health and medical benefits are provided under a written benefit plan. Each plan contains certain subrogation provisions under which UFCW is subrogated to and assigned all the rights and causes of action of its participants and beneficiaries for whom it pays benefits. UFCW's participants and beneficiaries were purchasers of one or more Covered Drugs during the class period described below.

7.    Plaintiff Alliance is a non-profit corporation organized under the laws of the State of Pennsylvania and is located in Philadelphia County, Pennsylvania. The Alliance has standing to bring suit for injunctive relief on behalf of its members, one or more of which have purchased and/or paid for one or more Covered Drugs during the class period defined below and who individually would have standing to sue in their own right. The interests at stake in this litigation are germane to the Alliance's purpose, and neither the claims asserted nor the injunctive relief requested requires the participation of individual members in the lawsuit.

8.    Defendant Baxter is a Delaware corporation with its principal place of business in the United States located in Deerfield, Illinois. Baxter is a global medical products and services company whose products and services are used to treat cancer, trauma, hemophilia, immune deficiencies, infectious diseases, kidney disease and other disorders. Employing more than 42,000

people worldwide, Baxter reported 2000 sales of $6.9 billion.

## RELEVANT MARKET

9.      As to the claims so requiring, the relevant geographic market is the United States

(Counts I, II, III, V, VI) and the Indirect Purchaser States (Count IV).

10.     The product market in this case is the market for Covered Drugs.

## CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this Sherman Act and RICO class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure, subsections 23(a) and 23(b)(2) and/or (b)(3), on behalf of a class

defined as follows:

> All individuals or entities in the United States who paid any portion
> of the 20% co-payment or deductible amount for themselves or for
> beneficiaries under Medicare Part B for one or more Covered Drugs
> during the period 1993 through the present ("Class Period")
> ("Nationwide End-Payor Class").

> All persons or entities in the United States who paid for any portion
> of the 20% co-payment or deductible amount for themselves, or for
> beneficiaries under Medicare Part B for one or more Covered Drugs
> in the District of Columbia, Arizona, California, Florida, Kansas,
> Louisiana, Maine, Michigan, Minnesota, Mississippi, Nevada, New
> Mexico, New Jersey, New York, North Carolina, North Dakota,
> South Dakota, Tennessee,Vermont, West Virginia or Wisconsin (the
> "Indirect Purchaser States") at any time during the Class Period (the
> "Indirect Purchaser State Subclass").

12.     The Nationwide End-Payor Class and Indirect Purchaser State Subclass may

hereinafter be collectively referred to as the "Class." Excluded from the Class are defendant, its

respective subsidiaries and affiliates, all governmental entities, and all judges and justices assigned

to hear any portion of this case.

13.     The members of the Class are so numerous, numbering in the thousands nationally,

that joinder of all members is impracticable. Plaintiffs' claims are typical of the claims of the Class

-4-

Members. Plaintiffs and Class Members were damaged in the same way by the same uniform, fraudulent, and illegal pattern of conduct by defendant.

14.     Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the plaintiffs coincide with, and are not antagonistic to those of, the Class. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation, including, for example, in the areas of healthcare, consumer and antitrust class actions.

15.     Questions of law and fact common to the Class include, but are not limited to:

(a)     Whether defendant engaged in a fraudulent scheme of improperly setting and/or adjusting the AWPs for the Covered Drugs;

(b)     Whether defendant artificially inflated the AWPs for the Covered Drugs in order to increase its market share, sales figures, and revenues;

(c)     Whether defendant prepared marketing and sales materials containing comparisons of the <u>Red Book</u> AWPs for the Covered Drugs and the actual average wholesale price for the Covered Drugs;

(d)     Whether defendant provided free samples of the Covered Drugs to doctors and other health care professionals so as to induce them to prescribe the Covered Drugs to its patients;

(e)     Whether defendant instructed doctors and other health care professionals to seek medicare reimbursement and consumer co-payment for free samples of the Covered Drugs;

(f)     Whether defendant induced doctors and other health care professionals to prescribe the Covered Drugs for patients in lieu of competing drugs;

-5-

(g)      Whether defendant engaged in a pattern and practice of paying illegal bribes or kickbacks to doctors and other health care professionals to induce them to prescribe the Covered Drugs to their patients;

(h)      Whether defendant engaged in a pattern and practice that caused the Class to overpay with respect to reimbursements for the Covered Drugs;

(i)      Whether defendant has monopolized and attempted to monopolize the relevant markets;

(j)      Whether defendant intentionally and unlawfully excluded competitors and potential competitors from the relevant markets, thereby restricting consumers' access to alternatives to the Covered Drugs;

(k)      Whether defendant conducted the affairs of the Prescription Enterprise as herein defined through a pattern of racketeering activity as defined under RICO;

(l)      Whether defendant participated in the operation and management of the association-in-fact Prescription Enterprise as herein defined;

(m)      Whether defendant received income derived from a pattern of racketeering activity and used or invested such income in the establishment and operation of the Prescription Enterprise;

(n)      Whether defendant used or invested the income derived from a pattern of racketeering activity in the operation or management of the Prescription Enterprise;

(o)      Whether plaintiffs and members of the Class were injured within the meaning of § 1964(c) of RICO as a direct and proximate result of defendant's

investment or other use of illegally-obtained income into the Prescription Enterprise;

(p)     Whether defendant's fraudulent scheme was carried out and furthered by the use of the United States mail and interstate wire services;

(q)     Whether defendant is liable to plaintiff UFCW and the Class for treble damages for conduct actionable under the civil provisions of the RICO statute;

(r)     Whether plaintiffs and the Class are entitled to injunctive relief; and

(s)     Whether defendant violated the state consumer fraud and antitrust acts enumerated herein.

16.     The above-identified common questions predominate over individual questions, if any, that may affect Class Members.

17.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, because such treatment will permit large numbers of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, cost effectively in a manner that would be impossible if there were to be filed numerous and separate individual actions. Furthermore, prosecution of separate actions by individual Class Members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for defendant.

18.     Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of others not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## FACTS

### A.     The Medicare Insurance Program

19.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or

"Medicare Program") to pay for the cost of certain medical services and care. The Act is codified at 42 U.S.C. § 1395 *et seq.*

20.     The U.S. Department of Health and Human Services ("HHS") is responsible for the funding, administration and supervision of the Medicare program. A division of the HHS, the Health Care Financing Administration ("HCFA"), is directly responsible for the administration of the Medicare program.

21.     HCFA contracted with private insurance companies, known as intermediaries and carriers, to receive, review, and pay appropriate claims for reimbursement for the provision of care to Medicare beneficiaries. Doctors who serve as medicare providers could prescribe, administer, or oversee the administration of a dose of one of the Covered Drugs to a patient who was a Medicare Program beneficiary, after which time the doctor could submit a claim to Medicare for reimbursement.

22.     As a general rule, the Medicare program does not pay for the cost of most prescription pharmaceuticals, such as drugs which a Medicare beneficiary self-administers by swallowing a liquid or pill form. Medicare Part B, however, does cover certain drugs, including i) those that cannot be self-administered and are related to a physician's services, such as cancer chemotherapy, or are provided in conjunction with covered durable medical equipment (DME), such as inhalation drugs used with a nebulizer, and ii) selected immunizations and certain drugs that can be self-administered, such as blood clotting factors and some oral drugs used in association with cancer treatment and immunosuppressive therapy.

23.     The "allowed" amount to be paid for a drug under Medicare is determined under the payment methodology set forth in 42 C.F.R. § 405.517, which was published in the Federal Register on November 25, 1991 and became effective on or about January 1, 1992.

24.     Prior to January 1, 1998, the "allowed" amount for Covered Drugs under Medicare Part B was on the basis of the lower of either: (i) the "estimated acquisition cost" or (ii) ninety-five percent (95%) of the "national average wholesale price" (the "AWP") for the drug. On January 1, 1998, the regulation was changed so that reimbursement was set at the lower of the actual charge on the Medicare claim for benefits or ninety-five percent (95%) of the AWP.

25.     Medicare Part B reimburses medical providers 80% of the allowable amount; the shortfall of 20% is paid by the Medicare beneficiary and is called the "co-payment" amount. In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

26.     In practice, several industry publications, including one call the Red Book, have been relied upon as the benchmark for setting medicare drug reimbursement rates. In fact, the Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement. Specifically, PM AB-99-63 states that drugs and biologicals are to be reimbursed by the Medicare Program based on the lower of the actual billed charge or 95 percent of the AWP reflected in pharmaceutical industry publication sources such as the Red Book, Blue Book, or Medispan.

27.     The Red Book and other publications publish AWP figures for the various dosages of Covered Drugs, and thus appear to be announcing objectively verified figures. But, in fact, the Red Book and similar publications merely published figures that were supplied to them by pharmaceutical manufacturers of such drugs – defendant in the instant case. The defendant realized that they could, and in actuality did, directly control, manipulate, and raise the AWP for Covered Drugs at various times by simply forwarding to the Red Book, or similar publications, a new and higher AWP. The effect on the market incentives that drive prescription choices regarding Covered

-9-

Drugs was dramatic.

28.     The AWPs reported by defendant and published in the <u>Red Book</u> for Covered Drugs – the figure upon which the Medicare reimbursement is determined – are substantially higher than the prices defendant charges private sector purchasers for Covered Drugs. The AWP set by defendant does not in any way accurately reflect the plain meaning or reasonable interpretations of the words "average" or "wholesale" that are critical components of that figure.

29.     As a direct and proximate result of defendant's pattern of artificially and fraudulently inflating the AWP for Covered Drugs above the average wholesale price actually reflective of the true market for the drug, plaintiffs and members of the Class substantially overpaid, in whole or in part, for Covered Drugs.

**B.      The Ongoing Government Investigation**

30.     Beginning in or about early 1999, the Congressional Committee on Commerce ("Commerce Committee") commenced an investigation of the prices that Medicare pays for Medicare-covered outpatient drugs. Over the course of the Commerce Committee's Investigation, Committee staff reviewed almost 100,000 pages of internal drug manufacturers' documents relating to pricing. By early May 2000, the Commerce Committee represented that "[its] investigative work has produced evidence indicating that some drug companies may be reporting artificially inflated reimbursement rates . . . and may be manipulating such prices in order to assist their sales and marketing efforts aimed at healthcare providers."

31.     Other federal committees and agencies that also joined in or have conducted their own investigation include, *inter alia*, the Department of Justice, the United States General Accounting Office ("GAO"), the Office of the Inspector General ("OIG"), certain subcommittees of the Congressional Committee on Energy and Commerce, the Committee on Ways and Means,

and HHS.

32.     As a result of the ongoing investigations, during May 2000, the Justice Department released to states a list of 479 drugs that the department said had inflated AWPs. (Guiden, "Special Report: States Mull Suits Against Drug Companies," http://www.stateline.org (April 2, 2001).)

33.     For the year 2000, the OIG found that Medicare's authorized payments for twenty-four (24) leading drugs were $887 million more than actual wholesale prices available to physicians and suppliers. Of this amount, beneficiaries, *i.e.*, consumers and third party payors, would have paid over $175 million less in coinsurances for just these twenty-four (24) leading drugs in the year 2000 alone had the cost of the drugs been based on actual wholesale prices.

34.     In September, 2001, the GAO published a Report to Congressional Committees entitled "Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost" (GAO-01-1118) ("GAO Report"). The GAO concluded that as a result of payments by Medicare based on "AWP, a price that may be neither an average nor what wholesalers charge, Medicare has been paying much more than providers' likely acquisition costs."

35.     On September 19, 2001, HHS' Centers for Medicare and Medicaid Services confirmed the GAO's Report, stating:

> The GAO confirms the finding of its previous reports along with previous reports from the Office of Inspector General that Medicare's payments for drugs are substantially higher than the actual costs to physicians and other providers acquiring these drugs.
> *      *      *      *      *
> We agree with GAO that Medicare needs to pay appropriately for all Medicare benefits, including the drugs we currently cover . . . .

(*See* Appendix II to GAO Report, GAO-01-1118).

36.     In the Prepared Witness Testimony of the Administrator for HHS' Centers for Medicare and Medicaid Studies for a September 21, 2001 hearing held by the Subcommittees on

-11-

Health, and Oversight and Investigations of the Congressional Committee on Energy and Commerce, the Administrator stated:

> Numerous studies have indicated that the industry's reported wholesale prices, the data on which Medicare payments are based, are vastly higher than the amounts that drug manufacturers and wholesalers actually charge providers. That means Medicare beneficiaries, through their premiums and cost sharing, and U.S. taxpayers are spending far more than the "average" price that we believe the law intended them to pay.

(http://energycommerce.house.gov/107/hearings/09212001Hearings371/Scully614print.htm).

**C.    Defendant's Fraudulent Marketing Scheme**

37.    In order to induce doctors nationwide generally to prescribe the Covered Drugs more often and specifically to prescribe them more than their competitors', defendant created an unlawful and fraudulent marketing scheme that relied upon two key elements: (i) the inflation of the average wholesale prices for the Covered Drugs, the figure upon which the Medicare reimbursement and consumer co-payments are based, and (ii) the use of fraudulently billed free samples and other illegal kickbacks and bribes.

**1.    Artificially Inflating the AWPs of Covered Drugs and Illegal Kickbacks or Bribes**

38.    Defendant artificially and intentionally inflated the AWPs of Covered Drugs that it reported to industry publications such as the Red Book. Defendant then charged doctors who prescribed Covered Drugs to their patients a price that was substantially less than the AWPs reported in the publications. Since any given physician's acquisition cost for one dose of a Covered Drug was significantly lower than the figure upon which the Medicare reimbursement for that same dose was based, doctors prescribing Covered Drugs were able to generate large, unlawful profits at the expense of the Medicare Program, third party payors, and consumers, including plaintiffs and the

-12-

Class.

39.     Under the scheme, medical providers who purchased Covered Drugs at one cost could then bill Medicare based upon the inflated AWPs, thereby earning a significant profit from the gap, or "spread," between the retail cost and Medicare reimbursement rate.  Defendant created and marketed this profit potential to influence medical providers' decisions to prescribe Covered Drugs instead of competing drugs on the market and to benefit from an increased market share for the Covered Drugs.

40.     Defendant further incentivized physicians to prescribe the Covered Drugs by giving them free samples of the drug and encouraging them to seek reimbursement from the Medicare Program for those samples, in clear violation of federal law.

41.     The execution of this scheme of fraudulent incentives was an interstate endeavor intentionally carried out by defendant's employees.

42.     The cooperation of many health care providers nationwide was a necessary component of defendant's fraudulent incentive scheme.

43.     Defendant has also provided and/or arranged for many other financial inducements to stimulate sales of the Covered Drugs at the expense of plaintiffs and the Class.

### 2.     Allegations Specific to Baxter

44.     The government's investigation revealed that Baxter has engaged in an ongoing deliberate scheme to inflate AWPs.  For example, by letter dated May 4, 2000 to the president of Baxter, the Chairman of the Commerce Committee revealed that:

> I am writing to you because one of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is Gammagard, a drug manufactured by Baxter International.

\*          \*          \*          \*

> The Office of Inspector General (OIG) at the Department of Health and Human Services determined that the Medicare-allowed amount for immune globulin, a pharmaceutical product sold by your company under the name Gammagard, in Fiscal year 1996 was $42.21. The OIG further estimated that the actual wholesale price of this drug was $16.12 and the highest available wholesale price that the OIG was able to identify was $32.11. The OIG has also estimated that, in Fiscal Year 1996 alone, Medicare could have saved $447 million if it had purchased Medicare-covered drugs at prices similar to those generally made available to private sector purchasers.

45.     Baxter's marketing pitches, as quoted by Representative Pete Stark, in a September 28, 2000 letter to the president of a national pharmaceutical trade group, further demonstrate defendant's fraudulent practices:

> BAXTER: "The attached notice from Quantum Headquarters was sent on April 10th to all their centers regarding the reduction on Recombinate pricing. Please note that they want to continue to be invoiced at the $.81 price. They have requested that we send them free product every quarter calculated by looking at the number of units purchased in that quarter and the $.13 reduction in price . . . free product given to achieve overall price reduction."

Exhibit 8 to Representative Stark's letter is an internal Baxter memorandum from a Baxter contract administrator to certain field sales managers encouraging the distribution of free product to achieve overall price reduction.

46.     Further, the government's investigation revealed that Baxter specifically increased the average wholesale prices for Covered Drugs in order to increase market share. For example, attached as Exhibit 3 to Representative Stark's letter is a document marked: "Confidential – Baxter Internal Use Only" that provides in pertinent part: "Increasing AWPs was a large part of our negotiations with the large homecare companies." Thus, Baxter's own documents demonstrate its active implementation of the scheme to artificially inflate AWPs.

-14-

47.     Defendant's marketing and sales documents, which were prepared and disseminated to their employees and agents via the U.S. mail and facsimile over wire, compared the costs of the Covered Drugs to their competitors', and were intended to induce physicians to use the Covered Drugs and shift market share.

**D.     Defendant's Use of the Mails and Wires in Furtherance of the Scheme**

48.     Defendant's illegal conduct and practice was carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfer of information, products and funds by mail and wire.

49.     The nature and pervasiveness of defendant's fraudulent marketing scheme, orchestrated out of defendant's corporate headquarters, necessarily required those defendant headquarters to communicate directly and frequently by United States mail and by facsimile over wire with the various local District Managers overseeing the sales force and the numerous pharmaceutical sales representatives who, in turn, directly communicated with the prescribing doctors.

50.     Moreover, defendant's conduct included mailing and transmitting via interstate wires numerous marketing and sales materials relating to the Covered Drugs, Medicare reimbursement rates, and profit margins to be earned by prescribing the drugs. Defendant also used the mail and wires to set the AWPs with the <u>Red Book</u> and other industry publications, as well as for arranging the illegal financial inducements discussed herein. Defendant also shipped free samples of its products that were used as inducements to physicians to prescribe the Covered Drugs.

**E.     Effects of Defendant's Scheme on Covered Drugs' Market Share and the Class**

51.     Defendant's illegal marketing scheme has substantially increased its market share for the Covered Drugs and total sales figures.

52.     Much of the substantial revenue defendant derived from the sale of the Covered Drugs was obtained from Third Party Payors and consumers, which have paid tens of millions of dollars for the Covered Drugs during the last decade.

### FRAUDULENT CONCEALMENT

53.     The running of any statute of limitations has been tolled by reason of defendant's fraudulent concealment.  Defendant and its co-conspirators actively concealed their fraudulent scheme to artificially elevate the price charged for the Covered Drugs by, *inter alia*, continually reporting to the Red Book and other publications AWPs having no relationship to the actual market cost of the Covered Drugs.

54.     Throughout the period of its unlawful conduct, defendant secretly and covertly met, discussed and agreed with its co-conspirators to artificially elevate the prices charged for the Covered Drugs.  Those meetings, discussions and agreements took place in private.  Plaintiffs and members of the Class were unaware of and could not through diligence have discovered these meetings and the unlawful conspiracy.

### COUNT I
### (On Behalf of the Nationwide End-Payor Class)
### Section 16 of the Clayton Act, 15 U.S.C. § 26

55.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

56.     As described above, defendant knowingly and willfully engaged in a course of conduct designed to extend its monopoly power beyond any lawful boundaries.  The result of defendant's unlawful conduct has been to cause damage and injury to plaintiffs and the other members of the Nationwide End-Payor Class in their business or property .

57.     By engaging in the unlawful anti-competitive and exclusionary conduct set forth

-16-

above, defendant intentionally and wrongfully excluded competition from the relevant markets, thereby maintaining its dominant market share in the relevant markets, and profited through its anti-competitive conduct by inflating the AWP of the Covered Drugs and reaping the benefits of the illegal monopoly.

58.     Plaintiffs and the other members of the Nationwide End-Payor Class have been injured in their business or property by reason of defendant's antitrust violations alleged in this Count. Their injury consists of paying higher co-payments and deductibles for the Covered Drugs than they would have paid in the absence of these violations. Their injury is of the type the antitrust laws were designed to prevent and flows from that which makes defendant's conduct unlawful.

59.     Accordingly, by reason of the injuries sustained by plaintiffs and the other members of the Nationwide End-Payor Class, the proximate cause of which is defendant's violations of the antitrust laws, plaintiffs are entitled to injunctive relief pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT II
### (On Behalf of the Nationwide End-Payor Class)
### For Monetary Damages for Violation of 18 U.S.C. § 1962(c)

60.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

61.     Defendant is a "person," within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an association-in-fact enterprise affecting interstate commerce through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

62.     The enterprise at issue is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of the various and independent medical providers who prescribed the Covered Drugs and engaged in fraudulent billing practices on the one hand, and the defendant, including their

-17-

directors, employees, and agents on the other hand ("Prescription Enterprise"). The Prescription Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals associated for the common purposes of selling, purchasing, prescribing, and administering the Covered Drugs to plaintiffs and their individual participants, and deriving profits from these activities.

63.     The Prescription Enterprise engages in and affects interstate commerce, because it engages in the following activities across state boundaries: the sale and/or purchase of the Covered Drugs, the transmission of sales and marketing literature, and the transmission and/or receipt of invoices and payments related to the use of the Covered Drugs. In addition, the Prescription Enterprise prescribes and/or administers the Covered Drugs to thousands of individuals throughout the United States.

64.     Defendant has exerted control over the Prescription Enterprise, and has directly or indirectly conducted or participated in the conduct of the affairs of the enterprise, in the following ways:

(i)     Defendant has directly controlled the price at which medical providers purchase the Covered Drugs;

(ii)    Defendant has directly controlled the AWPs that are reported in the Red Book and similar industry publications;

(iii)   Defendant has directly controlled the price at which medical providers are reimbursed by the Medicare Program;

(iv)    Defendant has directly controlled the creation and distribution of marketing, sales, and other materials used to inform medical providers nationwide of the profit potential of the Covered Drugs;

-18-

(v)    Defendant has directly controlled the marketing and sales scheme to artificially and unlawfully inflate the Medicare reimbursement rate (and co-payment rate) to induce medical providers to prescribe the Covered Drugs to their patients;

(vi)    Defendant has directly controlled the use and distribution of free samples of the Covered Drugs to medical providers;

(vii)    Defendant has directly or indirectly controlled the ability of medical providers to unlawfully seek reimbursement from the Medicare Program for free samples;

(viii)    Defendant has relied upon its employees and agents to promote the fraudulent marketing schemes herein alleged through the mail, through the wires, and through direct contacts with medical providers; and

(ix)    Defendant has controlled and participated in the affairs of the Prescription Enterprise by using a fraudulent scheme to manufacture, market and sell the Covered Drugs through the use of unlawful inducements to medical providers.

65.    Defendant has conducted and participated in the affairs of the Prescription Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. Defendant's pattern of racketeering likely involved hundreds, even thousands, of separate instances of use of the United States mail or the interstate wires in furtherance of its fraudulent and unlawful marketing scheme. Each of these fraudulent mailings and interstate wire transmissions separately constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the defendant intended to defraud plaintiffs and members of the Class.

66.     Defendant's fraudulent and unlawful marketing scheme consisted first of deliberately overstating the AWPs for the Covered Drugs, creating a "spread" based on the inflated figure to induce medical providers to prescribe the Covered Drugs to their patients, thereby causing the Medicare program to pay an artificially-inflated rate of reimbursement for the Covered Drugs. Defendant's fraudulent and unlawful marketing scheme also consisted of providing free samples of the Covered Drugs to medical providers, instructing these professionals to bill the Medicare program for these free samples, and providing other unlawful financial incentives, including kickbacks and bribes, to induce use of the Covered Drugs

67.     These schemes were calculated and intentionally crafted so as to ensure that the Medicare Program would be over-billed for the Covered Drugs. In designing and implementing these fraudulent schemes, defendant was at all times cognizant of the fact that the entire Medicare Program and all patients for whom the Covered Drugs are prescribed rely upon the honesty of defendant in setting the AWP as reported in the Red Book and similar publications.

68.     By intentionally and artificially inflating the AWP and by providing medical providers with unlawful financial inducements to use the Covered Drugs, and by subsequently failing to disclose such practices to the patients from whom reimbursement was sought through the United States mail or interstate wire transmission, defendant engaged in a repeated, fraudulent, and unlawful course of conduct constituting a pattern of racketeering.

69.     These racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiffs and members of the Class. Each separate instance of a racketeering activity perpetrated by the defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the Class. Defendant has engaged in the pattern of

racketeering activity for the purpose of conducting the ongoing business affairs of the Prescription Enterprise.

70. Defendant's violations and pattern of racketeering activity have directly and proximately caused plaintiffs and members of the Class to be injured in their property insofar as plaintiffs and members of the Class have paid millions of dollars in inflated reimbursements or other payments for the Covered Drugs.

71. Plaintiffs and members of the Class have relied to their detriment on billing statements that were based on information reported directly or indirectly by defendant, and that were sent through the United States mail. As a result of defendant's fraudulent acts, the billing statements so distributed have resulted in inflated payments by plaintiffs and the Class.

72. By virtue of these violations of 18 U.S.C. § 1962(c), defendant is jointly and severally liable to plaintiffs and members of the Class for three times the damages plaintiffs and the Class have sustained, plus the costs of this suit, including reasonable attorneys' fees.

## COUNT III
### (On Behalf of the Nationwide End-Payor Class)
### For Monetary Damages for Violation of 18 U.S.C. § 1962(a)

73. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

74. Throughout the Class Period, defendant has violated the federal RICO statute by using and investing income that was derived from a pattern of racketeering activity as herein discussed to acquire, establish and/or operate a variety of enterprises engaged in and affecting interstate commerce.

75. The enterprise is an association-in-fact within the meaning of § 1961(4) consisting of the independent medical providers of the Covered Drug on the one hand and the defendant,

including its employees and agents, on the other ("Prescription Enterprise'). The Prescription Enterprise, an ongoing organization functioning as a continuing unit, falls within the meaning of 18 U.S.C. § 1961(4) insofar as it consists of a group of "persons" associated together for the common purposes of buying, selling, prescribing, and administering the Covered drugs to the Class and their individual participants and deriving profits from these activities.

76.     Defendant engaged in a pattern of racketeering activity as set out herein.

77.     Plaintiffs and members of the Class have been directly and proximately injured in their property by the defendant's use and investment of the racketeering income into the acquisition, establishment and operation of the Prescription Enterprise. The injury to plaintiffs' and the Class's business or property stemming from these violations has been realized in the form of millions of dollars in over-payments they expended for the Covered Drugs.

78.     The use and investment of racketeering income by the defendant directly and proximately injured the plaintiffs and members of the Class in a manner that was distinct from the injury caused by the pattern of racketeering activity described herein.

79.     Plaintiffs and members of the Class relied, to their detriment, on the fraudulent billing statements sent to them through the United States mails.

80.     By virtue of these violations of 18 U.S.C. § 1962(a), defendant is jointly and severally liable to plaintiffs and members of the Class for three times the damages that they have sustained, the costs of this suit, and reasonable attorneys' fees.

### COUNT IV
**(One Behalf of the Indirect Purchaser State Subclass)**
**Monopolization and Attempt to Monopolize in Violation**
**Of the Laws of the Indirect Purchaser States**

81.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein

and further allege as follows.

82.    Defendant's monopolization and attempts to monopolize alleged herein violate the laws of the Indirect Purchaser States as follows:

(a)    Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Arizona Revised Statues §§ 44-1401, *et seq.* with respect to purchases of the Covered Drugs in Arizona by members of the Indirect Purchaser State Subclass ("Subclass");

(b)    Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of California Business and Professions Code §§ 16750 *et seq.* with respect to purchases of the Covered Drugs in California by members of the Subclass;

(c)    Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of the District of Columbia Antitrust Act of 1980, D.C. Code §§ 28-4502, *et seq.*, with respect to purchases of the Covered Drugs in the District of Columbia by members of the Subclass;

(d)    Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Florida Statutes §§ 501.201 *et seq.*, with respect to purchases of the Covered Drugs in Florida by members of the Subclass;

(e)    Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Kansas Statutes Annotated §§ 50-101, *et seq.*, with respect to purchases of the Covered Drugs in Kansas by members of the Subclass;

(f)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Louisiana Revised Statutes §§ 51:137, *et seq.*, with respect to purchases of the Covered Drugs in Louisiana by members of the Subclass;

(g)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Maine Revised Statutes Annotated, 10 M.R.S.A. §§ 1101, *et seq.*, with respect to purchases of the Covered Drugs in Maine by members of the Subclass;

(h)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Massachusetts Ann. Laws, Ch. 93 A, *et seq.*, with respect to purchases of the Covered Drugs in Massachusetts by members of the Subclass;

(i)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of the Michigan Antitrust Reform Act, MCL §§ 445.771, *et seq.*, with respect to purchases of the Covered Drugs in Michigan by members of the Subclass;

(j)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of the Minnesota Antitrust Act of 1961, Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of the Covered Drugs in Minnesota by members of the Subclass;

(k)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of the Nevada Revised Statutes, Nev. Rev. Stat. §§ 52:598A *et seq.*, with respect to purchases of the

Covered Drugs in Nevada by members of the Subclass;

(l)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of the New Jersey Stat. Ann., N.J.S.A. §§ 56:9-1, *et seq.*, with respect to purchases of the Covered Drugs in New Jersey by members of the Subclass;

(m)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to the Covered Drugs in New Mexico by members of the Subclass;

(n)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of New York General Business Law §§ 340, *et seq.*, with respect to purchases of the Covered Drugs in New York by members of the Subclass;

(o)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of the Covered Drugs in North Carolina by members of the Subclass;

(p)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of North Dakota Cent. Code §§ 51-08.1-0, *et seq.*, with respect to purchases of the Covered Drugs in North Dakota by members of the Subclass;

(q)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of South Dakota codified

Laws Ann. §§ 37-1, *et seq.*, with respect to purchases of the Covered Drugs in South Dakota by members of the Subclass;

(r)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of the Covered Drugs in Tennessee by members of the Subclass;

(s)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Vermont Stat. T. 9 § 2465, *et seq*, with respect to purchases of the Covered Drugs in Vermont by members of the Subclass;

(t)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of West Virginia Code §§ 47-18-1, *et seq.*, with respect to purchases of the Covered Drugs in West Virginia by members of the Subclass; and,

(u)     Defendant has intentionally and wrongfully maintained and abused its monopoly power in the relevant market in violation of Wisconsin Stat. §§ 133.01, *et seq.*, with respect to purchases of the Covered Drugs in Wisconsin by members of the Subclass.

83.     As a result of the conduct described above, Plaintiffs and the Subclass have sustained and will continue to sustain injury to their businesses and property in the form of, *inter alia*, paying prices for the Covered Drugs that were higher than they would have been but for Defendant's improper actions. The full amount of such damages are presently unknown and will be determined after discovery and upon proof at trial.

84.     Plaintiffs and the Subclass seek damages and treble damages, as permitted by law, for their injuries caused by these violation pursuant to these statutes.

## COUNT V
### (On Behalf of the Nationwide End-Payor Class)
### Statutory Fraud

85.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

86.     Plaintiffs bring this claim pursuant to the Illinois Consumer Fraud Act ("Consumer Fraud Act"), enacted to protect consumers against unfair, deceptive or fraudulent business practices. *See e.g.* 815 ILCS § 505/1 *et seq.*

87.     At all relevant times, plaintiff, the Class and Baxter were "persons" within the meaning of 815 ILCS 505/1(e).

88.     Section 2 of Consumer Fraud Act provides in pertinent part:

>       Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, . . . false promise, misrepresentation or concealment, suppression or omission of any material fact . . . in the conduct of trade or commerce are hereby declared unlawful.

815 ILCS 505/2.

89.     By failing to disclose the material facts listed above, defendant knew and intended that plaintiffs and the Class would purchase and continue to purchase the Covered Drugs, and would pay and continue to pay inflated copayments and deductibles as a result of defendant's manipulation of the AWPs for Covered Drugs.

90.     By concealing from plaintiffs and the Class the material facts listed above, defendant engaged in unfair, deceptive and fraudulent business practices within the meaning of the Consumer Fraud Act.

-27-

91.     The above-described unfair and fraudulent business practices by defendant continues to present a threat to members of the consuming public.

92.     As a result of this fraudulent and manipulative scheme of arbitrarily inflating the AWPs for Covered Drugs, defendant has been and will continue to be unjustly enriched at the expense of plaintiffs and the Class. Specifically, defendant has been unjustly enriched by the receipt of proceeds from the sales of tens of thousands of doses of the Covered Drugs sold to plaintiffs and the Class.

93.     Defendant's fraudulent scheme has proximately caused damages to plaintiffs and the other Class members, as described herein.

94.     Plaintiffs and the Class seek damages and punitive damages, attorneys fees, and costs, as permitted by law, for their injuries caused by these violation pursuant to these statutes.

**COUNT VI**
**(On Behalf of the Nationwide End-Payor Class)**
**Unjust Enrichment**

95.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows.

96.     As a result of the unlawful conduct described above, defendant has been and will continue to be unjustly enriched. Specifically, defendant has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated AWPs and illegal monopoly profits on its sale of the Covered Drugs.

97.     Defendant has benefitted from its unlawful acts and it would be inequitable for defendant to be permitted to retain any of its ill-gotten gains resulting from the overpayments for the Covered Drugs made by plaintiffs.

98.     Plaintiffs and members of the Class are entitled to the amount of defendant's ill-

-28-

gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiffs and the Class are entitled to the establishment of a constructive trust consisting of all overcharges from which plaintiffs and the Class members may make claims on a pro rata basis.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that:

(a)     The court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring plaintiffs as representatives of the Class and their counsel as counsel for the Class;

(b)     The conduct alleged herein be declared, adjudged and decreed to be unlawful in violation of the federal antitrust laws, RICO, the statutes of the Indirect Purchaser States set forth above, the statutes of the Consumer Fraud States set forth above and the common law of unjust enrichment;

(c)     Plaintiffs and the Class be granted an award of punitive damages, such amount to be determined at trial;

(d)     Plaintiffs and each member of the Class recover the amounts by which the Defendant has been unjustly enriched;

(e)     Defendant be enjoined from continuing the illegal activities alleged herein;

(f)     Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as a provided by law; and

-29-

(g)     Plaintiffs and the Class be granted such other, further, and different

relief as the nature of the case may require or as may be determined to be just,

equitable, and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Dated: November 15, 2001

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND and ACTION ALLIANCE OF SENIOR CITIZENS OF GREATER PHILADELPHIA, individually and on behalf of all others similarly situated, Plaintiffs

By: _____
    One of Plaintiffs' counsel

Kenneth A. Wexler
Elizabeth Fegan Hartweg
KENNETH A. WEXLER AND ASSOCIATES
One North LaSalle
Suite 2000
Chicago, Illinois 60602
(312) 346-2222

Daniel E. Gustafson
HEINS MILLS & OLSON, P.C.
700 Northstar East
608 Second Avenue South
Minneapolis, MN 55402

Ira Neil Richards
RODRIGUEZ & RICHARDS, LLC
The Penthouse
226 West Ritten House Square
Philadelphia, PA 19103

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA 18901

Lee Squitieri
SQUITIERI & FEARON
521 Fifth Avenue
26th Floor
New York, NY 10175

Jonathan Shub
SHELLER, LUDWIG & BADEY
1528 Walnut Street
3rd Floor
Philadelphia, PA 19102

-30-

Anthony Bolognese
BOLOGNESE & ASSOCIATES
One Penn Center
1617 JFK Boulevard
Suite 650
Philadelphia, PA 19103

Jonathan D. Karmel
KARMEL & GILDEN
221 N. LaSalle Street
Suite 1414
Chicago, IL 60601

Civil Cover Sheet

Page 1 of 1



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.



01C 8828

DOCKETED
NOV 1 6 2001

**Plaintiff(s):** UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, and ACTION ALLIANCE OF SENIOR CITIZENS OF GREATER PHILADELPHIA, a non-profit Pennsylvania corporation

**Defendant(s):**BAXTER INTERNATIONAL, INC.

County of Residence: Cook County, Illinois

County of Residence: Lake County, Illinois

Plaintiff's Atty:     Kenneth A. Wexler
                 Kenneth A. Wexler and Associates
                 One North LaSalle Street, Suite 2000
                 (312) 346-2222

Defendant's Atty:

FILED-EDS
01 NOV 15 PM 4: 02
CLERK
U.S. DISTRICT COURT

II. Basis of Jurisdiction:           **3. Federal Question (U.S. not a party)**

III. Citizenship of Principle Parties
**(Diversity Cases Only)**
                        Plaintiff:- **N/A**
                     Defendant:- **N/A**

IV. Origin :                      **1. Original Proceeding**

V. Nature of Suit:             **470 RICO**

VI.Cause of Action:          **Sherman Antitrust Act, 15 U.S.C. 2, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961**

VII. Requested in Complaint
                 Class Action: **Yes**
           Dollar Demand:
               Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 11/15/01

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**     Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE ASHMAN

In the Matter of

UNITED FOOD AND COMMERCIAL WORKERS
UNIONS AND EMPLOYERS MIDWEST HEALTH
BENEFITS FUND, and ACTION ALLIANCE OF
SENIOR CITIZENS OF GREATER PHILADEPHIA
v. BAXTER INTERNATIONAL INC.

Case Number:

01C 8828

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiffs

DOCKETED

NOV 16 2001

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Kenneth A. Wexler | NAME Elizabeth Fegan Hartweg |
| FIRM KENNETH A. WEXLER AND ASSOCIATES | FIRM KENNETH A. WEXLER AND ASSOCIATES |
| STREET ADDRESS One North LaSalle Street, Suite 2000 | STREET ADDRESS One North LaSalle Street, Suite 2000 |
| CITY/STATE/ZIP Chicago, IL 60602 | CITY/STATE/ZIP Chicago, IL 60602 |
| TELEPHONE NUMBER (312) 346-2222 | TELEPHONE NUMBER (312) 346-2222 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 03127810 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06229226 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES ✔ NO |
| | DESIGNATED AS LOCAL COUNSEL? YES ✔ NO |

| (C) | (D) |
|---|---|
| SIGNATURE Daniel E. Gustafson / KAW | SIGNATURE Marc H. Edelson / KAW |
| NAME Daniel E. Gustafson | NAME Marc H. Edelson |
| FIRM HEINS MILLS & OLSON, P.C. | FIRM HOFFMAN & EDELSON, LLC |
| STREET ADDRESS 700 Northstar East, 608 Second Avenue South | STREET ADDRESS 45 West Court Street |
| CITY/STATE/ZIP Minneapolis, MN 55402 | CITY/STATE/ZIP Doylestown, PA 18901 |
| TELEPHONE NUMBER (612) 338-4605 | TELEPHONE NUMBER (215) 230-8043 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES NO ✔ | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO ✔ |
| DESIGNATED AS LOCAL COUNSEL? YES NO ✔ | DESIGNATED AS LOCAL COUNSEL? YES NO ✔ |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE JOAN H. LEFKOW

Eastern Division

MAGISTRATE JUDGE ASHMAN

In the Matter of

UNITED FOOD AND COMMERCIAL WORKERS
UNIONS AND EMPLOYERS MIDWEST HEALTH
BENEFITS FUND, and ACTION ALLIANCE OF
SENIOR CITIZENS OF GREATER PHILADEPHIA
v. BAXTER INTERNATIONAL INC.

Case Number:

**01C 8828**

**DOCKETED**

NOV 1 6 2001

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiffs

| (A) | (B) |
|---|---|
| SIGNATURE *Lee Squitieri / KAW* | SIGNATURE *Ira Neil Richards / KAW* |
| NAME Lee Squitieri | NAME Ira Neil Richards |
| FIRM SQUITIERI & FEARON | FIRM RODRIGUEZ & RICHARDS |
| STREET ADDRESS 521 Fifth Avenue, 26th Floor | STREET ADDRESS 226 West Ritten House Square, Floor 32 |
| CITY/STATE/ZIP New York, NY 10175 | CITY/STATE/ZIP Philadelphia, PA 19103 |
| TELEPHONE NUMBER (646) 487-3049 | TELEPHONE NUMBER (215) 721-9004 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☑ | MEMBER OF TRIAL BAR?  YES ☐  NO ☑ |
| TRIAL ATTORNEY?  YES ☐  NO ☑ | TRIAL ATTORNEY?  YES ☐  NO ☑ |
|  | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☑ |
| (C) | (D) |
| SIGNATURE *Anthony Bolognese / KAW* | SIGNATURE *Jonathan Shub / KAW* |
| NAME Anthony Bolognese | NAME Jonathan Shub |
| FIRM BOLOGNESE & ASSOCIATES | FIRM SHELLER, LUDWIG & BADEY |
| STREET ADDRESS One Penn Center, 1617 JFK Boulevard, Suite 650 | STREET ADDRESS 1528 Walnut Street |
| CITY/STATE/ZIP Philadelphia, PA 19103 | CITY/STATE/ZIP Doylestown, PA 18901 |
| TELEPHONE NUMBER (215) 814-6750 | TELEPHONE NUMBER (215) 230-8043 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☑ | MEMBER OF TRIAL BAR?  YES ☐  NO ☑ |
| TRIAL ATTORNEY?  YES ☐  NO ☑ | TRIAL ATTORNEY?  YES ☐  NO ☑ |
| DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☑ | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☑ |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
Eastern Division

In the Matter of

UNITED FOOD AND COMMERCIAL WORKERS
UNIONS AND EMPLOYERS MIDWEST HEALTH
BENEFITS FUND, and ACTION ALLIANCE OF
SENIOR CITIZENS OF GREATER PHILADEPHIA
v. BAXTER INTERNATIONAL INC.

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE ASHMAN

Case Number:

01C 8828

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiffs

DOCKETED
NOV 1 6 2001

| (A) | | | | (B) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE *Jonathan D. Karmel (KAW)* | | | | SIGNATURE | | | |
| NAME Jonathan D. Karmel | | | | NAME | | | |
| FIRM KARMEL & GILDEN | | | | FIRM | | | |
| STREET ADDRESS 221 N. LaSalle Street, Suite 1414 | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP Chicago, IL 60601 | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER (312) 641-2910 | | | | TELEPHONE NUMBER | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ✔ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ✔ | |
| TRIAL ATTORNEY? | YES ☐ | NO ✔ | | TRIAL ATTORNEY? | YES ☐ | NO ✔ | |
| | | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ✔ | |
| (C) | | | | (D) | | | |
| SIGNATURE | | | | SIGNATURE | | | |
| NAME | | | | NAME | | | |
| FIRM | | | | FIRM | | | |
| STREET ADDRESS | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | | | TELEPHONE NUMBER | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ✔ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ✔ | |
| TRIAL ATTORNEY? | YES ☐ | NO ✔ | | TRIAL ATTORNEY? | YES ☐ | NO ✔ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ✔ | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ✔ | |